# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* YARBROUGH, Minors.

FOR PUBLICATION
January 19, 2016
9:00 a.m.

Nos. 326170; 326171
Wayne Circuit Court
Family Division
LC No. 14-516963-NA

Before: JANSEN, P.J., and CAVANAGH and GLEICHER, JJ.

GLEICHER, J.

The Department of Human Services filed a petition alleging that one or both respondent-parents physically abused their five-month-old son, JPY. Respondents denied hurting their child and sought funds for consultation with a medical expert regarding alternate causes for his injuries. The circuit court rejected their request, ruling that respondents had not established a reasonable probability that an expert would assist their defense. The issue presented is whether this decision denied respondents due process of law.

We conclude that the circuit court applied an incorrect standard for determining respondents' entitlement to expert assistance funding. Because a parent's interest in the accuracy of a decision to terminate his or her parental rights is "commanding," *Lassiter v Dep't of Social Servs of Durham Co*, 452 US 18, 27; 101 S Ct 2153; 68 L Ed 2d 640 (1981), the proper inquiry weighs the interests at stake under the due process framework established in *Mathews v Eldridge*, 424 US 319, 335; 96 S Ct 893; 47 L Ed 2d 18 (1976). Application of the *Eldridge* factors necessitated affording respondents with reasonable funds for expert consultation. We vacate the order terminating respondents' parental rights and remand for further proceedings.

I.

Respondents are the parents of JPY and a three-and-a-half-year-old daughter. On June 11, 2014, mother noticed that JPY's left eye appeared to deviate and had a "red dot" in it. Mother took the child to his pediatrician, who performed an examination and wrote an order for an MRI reciting: "baby not moving his left eye, please evaluate for mass or space occupying lesion or reason for [abducens] nerve dysfunction." Mother brought JPY directly to St. John Hospital for the procedure. The child was assessed in the St. John Hospital Emergency Room

-1-

that afternoon and no abnormalities were noted other than a "crossed eye." The MRI, performed with and without contrast material, revealed a normal, uninjured brain:

> There is nothing to indicate an abnormal fluid collection, space-occupying mass, focal signal abnormality, or focal enhancing lesion. There is no mass or abnormal signal involving the brainstem, and no space-occupying process within the prepontine or interpeduncular cisterns, nor suprasellar or cavernous sinus regions, on this MRI of the entire brain. No restricted diffusion is demonstrated. The ventricles, basal cisterns, and sulci over the convexities are within normal limits. The midline structures are within normal limits. The myelination pattern is within normal limits.

Mother and JPY left St. John at 7:00 p.m. Mother was instructed to watch JPY "carefully for breathing issues" and to return to the emergency department if any were noted.[1]

Mother noted that JPY felt a little warm that evening, but took a bottle and fell asleep. The next day, June 12, JPY continued to seem warm, acted "fussy," and took only four ounces of formula. Father arrived in the late afternoon to care for the children so mother could get something to eat.[2] Within five to 10 minutes of mother's departure, father saw "milky" "bubbles" coming from JPY's nose and mouth as the child lay on his back on a bed. JPY took three breaths and slumped "like a rubber doll." Father called 911 and requested an ambulance. The dispatcher instructed him how to perform CPR while awaiting the emergency personnel. Mother returned shortly after JPY's collapse and took over the CPR. When eight or nine minutes elapsed with no sign of an ambulance, the parents drove to St. John Hospital as mother continued CPR in the car.

On arrival at the hospital JPY was flaccid, unconscious, and had no pulse. He took only intermittent gasping breaths. After prolonged resuscitation JPY developed a heart rate. A physician noted that the infant's estimated "downtime" was approximately 30 minutes, and that the child had been ill with upper respiratory infection symptoms during the preceding week.[3] A

---

[1] The St. John records do not explain why the child was at risk for "breathing issues." Mother attempted to answer questions on this subject at the termination hearing, but the trial court ruled that "the second [someone] open[s] their mouth" and makes an out-of-court statement, "it would be hearsay" and inadmissible. The trial court's misperception of the hearsay rule permeated the trial of this case, as the trial court ruled virtually every out-of-court statement offered in evidence as automatically and incontrovertibly inadmissible. Of course, an out-of-court statement offered for a purpose other than proving the truth of the matter asserted within the statement is not hearsay. MRE 801(c). Further, multiple exceptions to the hearsay rule permit the admission of certain out-of-court statements. See MRE 803 and 804.

[2] The parents did not reside in the same home. Father worked during the day and would visit and care for the children in the evening, when mother worked.

[3] A blood test at St. John later proved positive for parainfluenza virus 3.

CT scan of JPY's brain obtained that evening revealed no acute findings and did not suggest a traumatic injury:

> There is no evidence of acute intracranial hemorrhage. The ventricular system is not dilated. Motion artifact is noted obscuring the left posterior parietal region.
>
> No masses or focal fluid collections are noted. Gray-white matter differentiation is grossly well-maintained given limits of low-dose technique. No sulcal effacement or evidence of mass effect.
>
> The orbits and paranasal sinuses are normal in appearance. The calvarium and overlying soft tissues are unremarkable.

The working diagnosis at St. John was that the child had suffered a prolonged cardiorespiratory arrest. He remained comatose.

A St. John social worker performed an evaluation and found no evidence to suspect child abuse. She noted in relevant part:

> Both parents and maternal grandmother exhibit appropriate concern for the patient. All 3 were tearful and disheartened by the entire event. The consultation for abuse and neglect does not, in the opinion of this worker, appear to be valid and social work sees no evidence of any maltreatment. This worker also spoke with the medical staff, who are in agreement that abuse or neglect does not appear to be the case for this family.

Late the next evening, St. John transferred JPY to Children's Hospital of Michigan for continuing intensive care. The physicians at Children's reviewed the MRI and CT scans performed at St. John and concluded that both demonstrated significant abnormalities, in contrast with the entirely normal findings reported by the radiologists who interpreted the same images at St. John. A Children's Hospital radiologist concluded that the St. John MRI revealed an "[i]nfra and supratentorial bilateral subdural hematoma" suggestive of prior trauma, and that the CT scan reflected the same subdural hematoma, as well as widening of the sutures and a "[r]ight parietal healing fracture with soft tissue swelling over the parietal convexity." A Children's Hospital ophthalmologist examined JPY and reported that the child had bilateral retinal hemorrhages. Physicians at Children's concluded that JPY was "a severely injured baby with subdural hemorrhages, bilateral retinal hemorrhages, skull fracture from abusive trauma." Petitioner filed a permanent custody petition on June 18, 2014.[4] The court authorized the petition on June 30, 2014.

---

[4] The Department of Human Services was the original petitioner. The department has since been reconfigured as the Department of Health and Human Services.

On September 22, 2014, mother filed a motion "for appointment of expert witness." The motion set forth the child's medical history and the conflicting diagnoses, asserting:

> In order to adequately rebut the anticipated expert opinion testimony presented by the State, Respondent must be able to retain and call her own expert to review the evidence of medical staff and to present an opinion (i.e., that the type of injuries to the child is not necessarily indicative of abuse by the parent; that there may be other explanations for the injury than abuse), particularly since the Mother adamantly denies any abuse or nonaccidental injury occurred.

The motion urged that mother was without funds to hire an expert, and "[i]n the interests of fairness, Respondent should be provided the same opportunity as the State to consult with a medical expert and call said expert to the stand to offer an opinion concerning causation of the injury."[5]

Father filed a concurring pleading. He averred that "only through the use of an independent, impartial expert can this party obtain a fair and impartial Trial inasmuch as the medical records and condition of this child are so involved and so difficult as to render [father's] counsel unable to appropriately cross exam[ine] the expert witnesses which will be provided and presented by the Attorney General's Office."

The family division judge declined to hear respondents' motions, as a Wayne County Local Administrative Order permits only the chief judge to authorize the payment of extraordinary fees in family division cases. During oral argument before the chief judge, mother's counsel outlined the medical background and requested funds for "an independent expert." Counsel estimated that "up to [$]2,500" would be needed. Father's lawyer stressed, "[w]e simply do not have the medical skills to be able to properly cross-examine the medical experts from Children's Hospital in a manner in which will provide the Court with sufficient information to reach an independent and informed conclusion." In response to the chief judge's suggestion that counsel arrange to speak to the treating physicians at both hospitals without payment, mother's counsel responded: "we would certainly prefer an independent expert" due to the implicit criticism of St. John's radiologic diagnoses lodged by the Children's Hospital child abuse unit physicians. "[I]n order to be fair to the parents and the parties in this case . . . and to level the playing field," counsel insisted, the parents were entitled to their own expert.

The chief judge denied the parents' funding request, relying on *People v Tanner*, 469 Mich 437, 443-444; 671 NW2d 728 (2003), and *People v Leonard*, 224 Mich App 569; 569 NW2d 663 (1997). The Court opined that the lawyers needed to learn "how to review medical records" on their own, and that a request for assistance in going through the records was insufficient to support funding for an expert. "You also have to demonstrate that it would be fundamentally unfair if I didn't appoint an expert," the court continued, "and you haven't demonstrated that to me."

---

[5] The last page or two of the brief accompanying mother's motion are missing from the court record.

The termination hearing commenced on December 8, 2014. Dr. Conrad Giles, a Children's Hospital ophthalmologist, testified that JPY had retinal hemorrhages apparent in all four quadrants of both eyes, consistent with "a Shaken Baby Syndrome." According to Dr. Giles, JPY had been shaken on "multiple" occasions well before June 14, 2014. Dr. Giles denied that any cause other than severe trauma could explain the hemorrhages, although he admitted that he had not reviewed the St. John records and lacked awareness of anything that had occurred before JPY's arrival at Children's Hospital, including JPY's respiratory and cardiac arrests. Dr. Deniz Altinok, a pediatric neuroradiologist, testified that JPY's St. John MRI revealed a subdural hematoma and that the CT scan showed evidence of prior head trauma. In Dr. Altinok's view, JPY had been severely shaken and his head subjected to an impact. Additional x-rays obtained at Children's demonstrated rib, leg and vertebral fractures. Dr. Altinok opined that the fractures resulted from deliberately inflicted trauma. Two additional physicians from Children's Hospital expressed expert opinions that JPY was the victim of severe abuse.

Mother and father denied causing JPY's injuries and offered no explanation for their etiologies. Mother called as a witness Dr. Beata Ruprecht, a St. John Hospital pediatric neurologist who had participated in JPY's evaluation and care. The court prevented Dr. Ruprecht from offering any opinions concerning the St. John MRI, finding her unqualified to do so.[6]

The court terminated respondents' parental rights under MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (g), (j), and (k)(*iii*), (k)(*iv*), and (k)(*v*), and found that termination of parental rights served the children's best interests. Both parents now appeal, contending that the chief judge abused his discretion by denying their requests for expert witness funding.

II.

In a criminal case, MCL 775.15 provides a judge with the authority to appoint an expert witness at public expense. *Tanner*, 469 Mich at 438. Appellate courts review such decisions for an abuse of discretion. *People v Carnicom*, 272 Mich App 614, 616; 727 NW2d 399 (2006). As this is a civil matter, MCL 775.15 does not apply. MRE 706, which permits a court to appoint and compensate an expert witness to assist the court, is likewise inapplicable; counsel sought an expert witness who would consult with and assist respondents, not the court.[7] On appeal,

---

[6] As a pediatric neurologist, Dr. Ruprecht testified that she regularly reviews and interprets brain imaging studies despite that she is not a radiologist. The trial court ruled that because Dr. Ruprecht was not an expert in radiology, she was unqualified to testify regarding the MRI findings.

[7] MRE 706 is identical to FRE 706. FRE 706 permits a trial court to appoint its own expert, particularly when the parties' retained experts "are in such wild disagreement that the trial court might find it helpful and in furtherance of the search for truth to appoint an independent expert." Saltzburg, Martin, & Capra, 3 Federal Rules of Evidence Manual (10th ed), § 706.02[1], p 706-3. "Quite simply, 'litigant assistance' is not the purpose of Rule 706." *Carranza v Fraas*, 471 F Supp 2d 8, 11 (D DC, 2007).

respondent-father has linked his request for funding to respondents' constitutional right to due process of law. We review de novo questions of constitutional law, including whether a child protective proceeding complied with a respondent's right to due process. *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286 (2009).

III.

Parents possess a fundamental interest in the companionship, custody, care and management of their children, an element of liberty protected by the due process provisions in the Fourteenth Amendment of the United States Constitution and article 1, § 17, of the Michigan Constitution. Because child protective proceedings implicate "an interest far more precious than any property right," *Santosky v Kramer*, 455 US 745, 758-759; 102 S Ct 1388; 71 L Ed 2d 599 (1982), "to satisfy constitutional due process standards, the state must provide the parents with fundamentally fair procedures." *Hunter v Hunter*, 484 Mich 247, 257; 771 NW2d 694 (2009) (quotation marks and citation omitted).

Here, we consider whether the termination proceedings were fundamentally fair despite respondents' inability to retain expert consultation. Our analysis of this question draws on a series of cases addressing the "age-old problem" of "[p]roviding equal justice for poor and rich, weak and powerful alike." *Griffin v Illinois*, 351 US 12, 16; 76 S Ct 585; 100 L Ed 2d 891 (1956). We find one such case, *MLB v SLJ*, 519 US 102; 117 S Ct 555; 136 L Ed 2d 473 (1996), particularly instructive. In *MLB*, the United States Supreme Court held that the state of Mississippi could not constitutionally require indigent parents appealing the termination of their parental rights to pay record and transcript preparation fees. *Id.* at 127-128. In reaching this decision, the Supreme Court majority dubbed *Griffin* "the foundation case." *Id.* at 110.

*Griffin* struck down a rule that conditioned appeals of criminal convictions on an indigent defendant's procurement of trial transcripts that he could not afford, the *MLB* Court summarized. *Id.* Although the *MLB* dissenters argued against extending *Griffin* to civil cases involving the termination of parental rights, the *MLB* majority rejected that argument for reasons that resound here:

> [W]e have repeatedly noticed what sets parental status termination decrees apart from mine run civil actions, even from other domestic relations matters such as divorce, paternity, and child custody. To recapitulate, termination decrees work a unique kind of deprivation. In contrast to matters modifiable at the parties' will or based on changed circumstances, termination adjudications involve the awesome authority of the State to destroy permanently all legal recognition of the parental relationship. Our *Lassiter*[8] and *Santosky*[9] decisions, recognizing that

---

[8] In *Lassiter*, 452 US 18, the Supreme Court analyzed whether the indigent respondent was unconstitutionally denied appointed counsel in a proceeding that terminated her parental rights. The Court's due process determination rested on its application of the factors set forth in *Mathews v Eldridge* to the particular facts of that case.

parental termination decrees are among the most severe forms of state action have not served as precedent in other areas. We are therefore satisfied that the label "civil" should not entice us to leave undisturbed the Mississippi courts' disposition of this case. [*Id.* at 127-128 (quotation marks and citations omitted).]

In *MLB*, the Court emphasized that proceedings to terminate a parent's relationship with a child implicate rights "of basic importance in our society," demanding "the close consideration the Court has long required when a family association so undeniably important is at stake." *Id.* at 116-117 (quotation marks and citation omitted). Quoting *Santosky*, the Court highlighted that "[f]ew forms of state action . . . are both so severe and so irreversible." *Id.* at 118. The Court acknowledged that its precedents concerning access to judicial proceedings draw on both equal protection and due process principles, elucidating that "in the *Griffin*-line cases," due process and equal protection theories "converge." *Id.* at 120 (quotation marks and citation omitted). The Court located *MLB* "within the framework established by our past decisions in this area." *Id.* Without identifying the "framework" by name, the Court proceeded to employ the three-part procedural due process analysis formally introduced in *Eldridge*.

In *Eldridge*, 424 US at 323-324, the Supreme Court considered whether a state agency may terminate a recipient's social security disability benefits without affording the recipient an opportunity for an evidentiary hearing. The Court painstakingly described the "elaborate" web of procedures that precede a final decision terminating disability benefits. *Id.* at 337-339. It then analyzed the constitutional adequacy of those procedures according to a three-factor balancing framework:

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. [*Id.*]

*Eldridge* concluded that the Due Process Clause did not mandate a hearing prior to the initial termination of a claimant's benefits. *Id.* at 343. In large measure, the Supreme Court rested its decision on "the fairness and reliability of the existing predetermination procedures," which entailed a low risk of error. *Id.* at 343-345.

The Court reached a different result when it applied the *Eldridge* framework in *MLB*. Weighing the interests of the petitioner-parent ("forced dissolution of her parental rights") against the state's "pocketbook interest in advance payment for a transcript," *MLB*, 519 US at 121, the Court found the latter interest less compelling. The Court turned to the "risk of error"

---

[9] In *Santosky*, 455 US at 758, the Supreme Court again applied the *Eldridge* factors in a termination of parental rights case, concluding: "Evaluation of the three *Eldridge* factors compels the conclusion that use of a 'fair preponderance of the evidence' standard in such proceedings is inconsistent with due process."

attending Mississippi's appeal procedures and observed that the Chancellor's opinion terminating MLB's rights consisted merely of statutory language and described no evidence or reasons for the Chancellor's findings. "Only a transcript can reveal to judicial minds other than the Chancellor's the sufficiency, or insufficiency, of the evidence to support his stern judgment." *Id*. at 121-122. The fiscal obligation imposed by a transcript requirement did not tilt the scale, in the Court's view, as in parental termination cases "appeals are few, and not likely to impose an undue burden on the State." *Id*. at 122. "In accord with the substance and sense of our decisions in *Lassiter* and *Santosky*," the Court concluded, "we place decrees forever terminating parental rights in the category of cases in which the State may not 'bolt the door to equal justice.' " *Id*. at 124 (citation omitted).

Our Supreme Court recently employed *Eldridge* to strike down the one-parent doctrine, which permitted courts to obtain jurisdiction over a child and proceed to disposition with respect to both parents based on an adjudication of only one. *In re Sanders*, 495 Mich 394, 408; 852 NW2d 524 (2014). The Court described that "[i]n essence, the *Eldridge* test balances the costs of certain procedure safeguards . . . against the risks of not adopting such procedures." *Id*. at 411. Tracking the *Eldridge* guideposts, the Supreme Court first considered "the private interest at stake here—a parent's fundamental right to direct the care, custody, and control of his or her child free from governmental interference, [which] cannot be overstated." *Id*. at 415. As to the second and third *Eldridge* factors, the Court continued:

> [I]t is undisputed that the state has a legitimate and important interest in protecting the health and safety of minors and, in some circumstances, that the interest will require temporarily placing a child with a nonparent. It is this interest that lies at the heart of the state's *parens patriae* power. But this interest runs parallel with the state's interest in maintaining the integrity of the family unit whenever possible. MCL 712A.1(3) ("This chapter shall be liberally construed so that each juvenile coming within the court's jurisdiction receives the care, guidance, and control, *preferably in his or her own home,* conducive to the juvenile's welfare and the best interest of the state.") (emphasis added). When a child is parented by a fit parent, the state's interest in the child's welfare is perfectly aligned with the parent's liberty interest. But when a father or mother is erroneously deprived of his or her fundamental right to parent a child, the state's interest is undermined as well: "[T]he State registers no gain towards its declared goals when it separates children from the custody of fit parents." In other words, the state ordinarily has an equally strong interest in ensuring that a parent's fitness, or lack thereof, is resolved before the state interferes with the parent-child relationship. Thus, the probable value of extending the right to an adjudication to each parent in a child protective proceeding benefits both public and private interests alike. [*Id*. at 415-417 (case citations omitted, second and third alterations in original).]

Although the Court found that an adjudication of both parents would "increase the burden on the state in many cases," the Court held that this process was nevertheless indispensable, as "an adjudication would significantly reduce any risk of a parent's erroneous deprivation of the parent's right to parent his or her children." *Id*. at 417. Guided by the *Eldridge* factors, the Court concluded that the burden of extending the right to an adjudication to all parents did not

outweigh the risk that a parent could be deprived of her child's custody absent a finding of unfitness. *Id.* at 418-419.[10]

One additional *Eldridge* case informs our decision. Although the case arises from the criminal law, we find its teachings valuable and relevant here.

In *Ake v Oklahoma*, 470 US 68, 77; 105 S Ct 1087; 84 L Ed 2d 53 (1985), the United States Supreme Court declared, "a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense." The Court grounded this pronouncement in the Due Process Clause, which guarantees that an indigent defendant facing the judicial power of the State must have "a fair opportunity to present his defense." *Id.* at 76. While this principle does not require a state to "purchase for the indigent defendant all the assistance that his wealthier counterpart might buy," it does obligate the state to provide the " 'basic tools of an adequate defense[.]' " *Id.* at 77, quoting *Britt v North Carolina*, 404 US 226, 227; 92 S Ct 431; 30 L Ed 2d 400 (1971).

In *Ake*, the "basic tool" was the assistance of a consulting psychiatrist. The United States Supreme Court framed the issued presented in that case as "whether, and under what conditions, the participation of a psychiatrist is important enough to preparation of a defense to require the State to provide an indigent defendant with access to competent psychiatric assistance in preparing the defense." *Ake*, 470 US at 77.[11] The Court analyzed this question by weighing the three guideposts for determining the process due in a particular case set forth in *Eldridge*.

The Supreme Court observed in *Ake*, "[t]he interest of the individual in the outcome of the State's effort to overcome the presumption of innocence is obvious and weighs heavily[.]" *Id.* at 78. The State's interest is solely economic: husbanding the public fisc. This is so because "the State's interest in prevailing at trial – unlike that of a private litigant – is necessarily tempered by its interest in the fair and accurate adjudication of criminal cases." *Id.* at 78-79. "[A] State may not legitimately assert an interest in maintenance of a strategic advantage over the defense, if the result of that advantage is to cast a pall on the accuracy of the verdict obtained." *Id.* at 79. The Supreme Court determined in *Ake* that the first two *Eldridge* criteria weighed heavily in the defendant's favor: "We therefore conclude that the governmental interest in denying Ake the assistance of a psychiatrist is not substantial, in light of the compelling interest of both the State and the individual in accurate dispositions." *Id.*

---

[10] *Sanders* was not the first Michigan child protective case to employ *Eldridge*. See also *In re Rood*, 483 Mich 73, 92; 763 NW2d 587 (2009).

[11] A number of courts have applied *Ake*'s reasoning to a defendant's requests for expert assistance in areas other than psychiatry. For a list and summary of the cases, see Giannelli, *Ake v. Oklahoma: The Right to Expert Assistance in a Post-Daubert, Post-DNA World*, 89 Cornell L Rev 1305, 1367-1368 (2004), and *Moore v State*, 390 Md 343, 409 n 12; 889 A2d 325 (2005) ("The majority of courts have concluded that *Ake* extends beyond psychiatric experts.").

The last *Eldridge* component examines the "probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided." *Id.* In *Ake*, the Supreme Court's evaluation of this factor centered on the critical role played by a psychiatric expert in a trial involving a defendant's mental condition. The Court elucidated:

> [T]he assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense. In this role, psychiatrists gather facts, through professional examination, interviews, and elsewhere, that they will share with the judge or jury; they analyze the information gathered and from it draw plausible conclusions about the defendant's mental condition, and about the effects of any disorder on behavior; and they offer opinions about how the defendant's mental condition might have affected his behavior at the time in question. They know the probative questions to ask of the opposing party's psychiatrists and how to interpret their answers. Unlike lay witnesses, who can merely describe symptoms they believe might be relevant to the defendant's mental state, psychiatrists can identify the "elusive and often deceptive" symptoms of insanity and tell the jury why their observations are relevant. Further, where permitted by evidentiary rules, psychiatrists can translate a medical diagnosis into language that will assist the trier of fact, and therefore offer evidence in a form that has meaning for the task at hand. Through this process of investigation, interpretation, and testimony, psychiatrists ideally assist lay jurors, who generally have no training in psychiatric matters, to make a sensible and educated determination about the mental condition of the defendant at the time of the offense. [*Id.* at 80-81(citation omitted).]

The Court's meticulous depiction of the function of a psychiatrist appointed to aid the defense in an insanity case bears special significance here. The medical assistance sought by respondents parallels that described by the Supreme Court in *Ake*. Just as a psychiatrist can "translate a medical diagnosis into language that will assist the trier of fact," a radiologist can decode black and white images on a scan, or analyze tests that have been performed to determine whether the results were normal or abnormal, or if additional medical studies would have provided critical diagnostic information.

We are not the first appellate court to look to *Ake* for guidance in a case involving the termination of parental rights. See *State ex rel Children Youth & Families Dep't v Kathleen DC*, 141 NM 535, 540; 157 P3d 714 (2007) ("[I]n certain circumstances, due process may require the appointment of an expert witness at the State's expense to an indigent parent in a neglect and abuse proceeding."); *In re Shaeffer Children*, 85 Ohio App 683, 691; 621 NE2d 426 (1993) (applying *Eldridge* and *Ake* in holding due process required the appointment of a psychiatric expert to assist the mother "in the preparation of her defense"). And *Ake* counsels that fulfilment of a respondent's due process rights may sometimes require state-funded access to an expert to assist in the evaluation, preparation and presentation of a defense.

IV.

Petitioner and the children's guardian ad litem assert that the trial court's decision fell within the range of principled outcomes, as respondents failed to identify an actual expert who would likely benefit the defense, and offered only an "amorphous" request rather than a "well-reasoned argument" in support of their motion for funding of an expert witness or consultant. The chief judge reached a similar conclusion in denying respondents' motion. We reject these arguments, as respondents plainly demonstrated that petitioner's case rested exclusively on expert medical testimony involving complex, controversial medical issues, and that counsel lacked the tools necessary to challenge petitioner's experts. Child abuse science was not collateral or unimportant to these proceedings; expert testimony formed the whole of petitioner's proofs. The record amply supports that petitioner's case rose or fell on the trial court's assessment of the science advocated by petitioner, as no other evidence suggested that respondents had deliberately harmed their son. Without physician-witnesses to translate the medical records and to express expert conclusions, petitioner would have lacked *any* evidence to seek termination of respondents' rights. This fact supplied the requisite nexus between respondents' request and the issues presented, and established a reasonable probability that an expert would be of meaningful assistance.

Nor are we persuaded by the two cases cited by the chief judge as authority for denying respondents' motion, *Tanner*, 469 Mich 437, and *Leonard*, 224 Mich App 569. *Tanner* concerned the construction of MCL 775.15, a statute that applies only in criminal cases. We discuss *Tanner* only to explain why it lacks relevance even by way of analogy.

The defendant in *Tanner* sought expert assistance regarding the interpretation of DNA evidence that actually *excluded* the defendant as the perpetrator of the crime. *Tanner*, 469 Mich at 440. Although serological testing of other samples tended to inculpate the defendant, her counsel did not seek to have the blood retested so that the serology results could be confirmed. *Id*. In the trial court, counsel argued that "he wanted an expert to help him better understand the DNA evidence and possibly to testify at trial." *Id*. at 441. The trial court denied the request, and the Supreme Court held that the trial court had not abused its discretion. Because the DNA evidence was exculpatory, the defendant failed to show that "she could not safely proceed to trial" without the assistance of a DNA expert. *Id*. at 444. Although the serology evidence linked the defendant to the crime, the Supreme Court determined that the defendant "did not establish that an expert serologist would offer testimony that would 'likely benefit the defense,' " as required by MCL 775.15. *Id*. at 443-444.

Here, respondents amply established that expert consultation was necessary to their defense and would likely benefit them. The medical records confirmed the existence of a profoundly important contradiction. On one hand, St. John physicians determined that JPY's MRI and CT scans showed no evidence of trauma or any other abnormality. On the other hand, the Children's medical experts determined that the same films demonstrated powerful evidence of abuse. Respondents' counsel were incapable of resolving or understanding this critical evidentiary inconsistency without expert assistance.

While we agree that counsel should strive to read and understand medical records and to conduct independent medical research, it is simply unrealistic to expect that such concerted study will yield the expertise necessary to interpret MRI or CT scans, or effectively cross-examine an adversary expert witness steeped in years of medical training, knowledge and experience.

-11-

Absent expert assistance, respondents' lawyers could not capably question or undermine the brain imaging evidence, which formed an essential part of petitioner's case.[12] Nor could respondents put forth any alternative theories regarding the cause of JPY's retinal hemorrhages, such as prolonged hypoxia followed by resuscitation and ventilation.[13] Realistically, without expert assistance respondents' counsel had no serviceable tools that would assist them in fairly evaluating the strengths and weaknesses of petitioner's medical evidence, or in advancing a different hypothesis.

Nor do we find that the trial court properly relied on *Leonard*. This Court concluded in *Leonard* that the defendant's lack of a DNA expert at trial did not deprive him of due process of law. *Leonard*, 224 Mich App at 583. We further noted that defense counsel neglected to file a formal motion seeking an expert witness, and "did not indicate that he required expert assistance to cross-examine the prosecution's experts." *Id*. at 585. These facts fully distinguish *Leonard* from the case at hand. Moreover, a federal district court ultimately granted Leonard's petition seeking a writ of habeas corpus, finding that "[d]efense counsel's overall ignorance of DNA analysis and lack of preparedness rendered his assistance" constitutionally ineffective. *Leonard v Michigan*, 256 F Supp 2d 723, 728 (WD Mich, 2003). The prosecution did not appeal that ruling to the Sixth Circuit Court of Appeals. Thus, *Leonard* provides petitioner with no support for its contention that the chief judge appropriately denied respondents' request for funding.

V.

Respondent-mother's motion for "the appointment of an expert witness" cited no specific statute or court rule, but relied instead on "the interests of fairness." Respondent-father premises his argument in this Court on due process principles. We acknowledge the dearth of published decisions in the child welfare arena regarding the standards a court should apply when considering a request for expert witness funding. At its core, respondents' request for funding relates to "the essential fairness of the state-ordered proceedings," *MLB*, 519 US at 120. Accordingly, we follow the lead of the United States and Michigan Supreme Courts and situate our legal analysis within the *Eldridge* framework. In deciding whether the chief judge abused his discretion by denying respondents' funding motion, we examine the private and governmental interests at stake, the extent to which the procedures otherwise available to respondents served their interests, and the burden on the state of providing expert funding in this case. *Eldridge*, 424 US at 335.

---

[12] It is similarly unrealistic to expect counsel to have found an expert willing to review the imaging studies and the voluminous medical records in this case for free, on the "if come" that a court might someday agree to some funding. Such medical volunteers likely are exceedingly rare. We also reject the notion that counsel could and should have presciently ascertained a potential expert's opinions without consulting with an expert.

[13] See Squier, *The "Shaken Baby" Syndrome: Pathology and Mechanisms*, 122 Acta Neuropathol 519, 530 (2011).

We need spend little time on *Eldrige*'s first rung: the private interests at stake. For respondents, the "accuracy and []justice" of a decision terminating their rights to their children is "a commanding one." *Lassiter*, 452 US at 27. As emphasized in *Sanders*, 495 Mich at 415, the importance of the fundamental rights at risk in a termination proceeding "cannot be overstated." Petitioner, too, has a compelling interest in the safety and welfare of children. Importantly, this *parens patriae* interest "favors preservation, not severance, of natural family bounds." *Santosky*, 455 US at 766-767. Alternatively stated, "[s]ince the State has an urgent interest in the welfare of the child, it shares the parent's interest in an accurate and just decision." *Lassiter*, 452 US at 27. Petitioner's interest in prevailing at a trial must yield to its interest in a fair proceeding that protects a parent's constitutional rights.

In this case, the private interests strongly favored funding for an expert witness or consultant. As we have stated, the medical evidence conflicted concerning whether JPY sustained trauma to his brain before his respiratory arrest. The science swirling around cases involving "shaken baby syndrome" and other forms of child abuse is "highly contested." *People v Ackley*, 497 Mich 381, 394; 870 NW2d 858 (2015). Dr. Giles's opinion that JPY's retinal and subdural hemorrhages could manifest only child abuse has been vigorously challenged by scientists worldwide and in courtrooms throughout this country. See Findley *et al*, *Shaken Baby Syndrome, Abusive Head Trauma, and Actual Innocence: Getting It Right*, 12 Hous J Health & Policy 209 (2012). As the Findley article discusses in detail, many of the conventional assumptions underlying medical opinions that a parent abused a child have proven fundamentally flawed. Recent scientific studies and careful reviews of older studies have called into question the reliability of certain findings, including subdural and retinal hemorrhage, in confirming child abuse. Indeed, even skeletal findings thought to confirm abuse also may be accurately explained by "accidental trauma, metabolic bone disease and/or nutritional deficiencies." *Id*. at 255.[14] Getting it right, medically and scientifically, protects the shared interests of petitioner and respondents. Handicapping one side's ability to present relevant evidence hampers rather than enhances the search for truth.

Next, we consider whether the nature of the child welfare proceedings adequately safeguarded respondents' interests, absent funding for an independent expert. This inquiry requires us to focus on the due process safeguards incorporated in the child protective process. In *Eldridge*, the Supreme Court determined that the procedures governing administrative claims challenging the termination of disability benefits provided "effective process" for asserting the claim, and "also assure[d] a right to an evidentiary hearing, as well as to subsequent judicial review," before the denial of a claim became final. *Eldridge*, 424 US at 349. The interconnected web of state and federal procedures required to terminate social security disability benefits sufficed for due process purposes.

In contrast, a termination of parental rights proceeding is fundamentally adversarial and lacks the "checks and balances" built into the disability benefit process. Thus, when only one

---

[14] During cross-examination, one of the prosecution's experts (Dr. Mary Lou Angelilli) conceded that no tests were performed to determine whether metabolic causes existed for JPY's fractures.

side possesses the funds necessary to pay an expert witness, the opposing side must rely on cross-examination to attack the experts' testimony. In a case involving highly technical matters which few laypeople readily understand, the task of cross-examination without expert consultation presents a steep uphill climb. Lacking an expert's guidance, respondents' counsel could not interpret the CT or MRI scans, or understand whether additional specific laboratory tests should have been ordered or likely would have supplied pertinent clinical information. Furthermore, even when counsel confronted several of the Children's Hospital witnesses with potential evidentiary contradictions or the existence of other theories regarding child abuse science, counsel were stuck with the answers they elicited. Counsel had no evidence to offer in rebuttal or to employ in establishing a testimonial weakness. We are unconvinced that the availability of cross-examination uninformed by expert consultation adequately reduces the risk of error in a termination proceeding engulfed with scientific and medical evidence, as was this one.

Lastly, we look to the government's interest, including the fiscal and administrative burdens that payment for an expert would impose. Here, mother's counsel estimated that respondents needed "up to $2,500" to secure expert consultation. While this sum is not insubstantial, it hardly qualifies as unreasonable. We are unconvinced that the burden of a payment in this range should have outweighed the interests of these indigent parents, who otherwise lack the financial resources to retain expert medical consultation.

In sum, after weighing the respective private and public interests, we hold that the chief judge abused his discretion by failing to employ the requisite due process analysis under *Eldridge*, and by refusing to authorize reasonable expert witness funding in this case. We highlight that the *Eldridge* due process framework is inherently fact-specific: "due process is flexible and calls for such procedural protections as the particular situation demands." *Eldridge*, 424 US at 334 (quotation marks, citation, and alteration omitted). Under the circumstances presented here, no meaningful alternative evidentiary safeguards afforded respondents an opportunity to challenge petitioner's child abuse theory, despite that the St. John evidence clearly called the reliability of that evidence into question. This abridgment of respondents' due process rights requires a new termination hearing, should respondents elect to request one after they have been afforded a reasonable fee for expert consultation.

We vacate the order terminating respondents' parental rights and remand for proceedings consistent with this opinion. We do not retain jurisdiction.


/s/ Elizabeth L. Gleicher
/s/ Mark J. Cavanagh