*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* M N KARNES, Minor.

UNPUBLISHED
March 23, 2023

No. 361520
Cass Circuit Court
Family Division
LC No. 08-000057-NA

Before: K. F. KELLY, P.J., and BOONSTRA and REDFORD, JJ.

PER CURIAM.

In this child protection proceeding, respondent-mother appeals by right the trial court's order terminating her parental rights to MK, who was 15 years of age at the time of the termination. Respondent-mother argues on appeal that the trial court erred when it found that the petitioner, the Department of Health and Human Services (DHHS or petitioner), made reasonable efforts to reunify her with MK. She also argues that the trial court erred in its best-interest findings and erred when it failed to appoint an expert on childhood trauma to assist her defense. Because we conclude that respondent-mother has not identified any errors that warrant relief, we affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

This Court previously affirmed the trial court's order of adjudication involving MK.[1] For the sake of brevity, we will not restate in detail the facts and procedural history leading up to the adjudication. In brief, MK was removed from respondent-mother's care after MK disclosed that several men had sexually abused her while under respondent-mother's care. The issues that led to adjudication included respondent-mother's failure to protect MK from sexual abuse and respondent-mother's disbelief regarding MK's allegations.

---

[1] See *In re Karnes/Glaser, Minors*, unpublished per curiam opinion of the Court of Appeals, issued December 16, 2021 (Docket No. 357345). The proceedings below involved an additional respondent as well as an additional child. The portions of the proceedings pertaining to those parties have been omitted from our recitation of the facts of this case, as they are not parties to this appeal.

In May 2021, at the first dispositional hearing following the adjudication trial, the trial court ordered that petitioner provide respondent-mother and MK with services, including psychological evaluations, individual therapy, and many other services designed to address MK's severe trauma resulting from sexual assault. Respondent-mother generally participated in the services offered, although she continued to have contact with one of the men whom MK had accused of sexual assault. Respondent-mother's parenting time with MK was suspended. Over the next several months, MK's lawyer-guardian ad litem (LGAL), as well as the foster care worker assigned to the case, consistently informed the court that MK was traumatized by the sexual abuse she had suffered, respondent-mother's failure to protect her, and the fact that respondent-mother did not believe she had been sexually abused. MK's placement with her maternal aunt was going well and her aunt was willing to adopt her.

In October 2021, the trial court authorized petitioner to file a petition for the termination of respondent-mother's rights to MK. Petitioner did so, and the termination hearing began in February 2022, ultimately concluding in May 2022. At the termination hearing, Dr. James Henry testified as an expert on child trauma and sexual abuse, and provided extensive testimony concerning the complex trauma suffered by MK as the result of repeated sexual-abuse, including MK's fears that she would again be sexually abused if returned to respondent-mother's care and the significant emotional trauma associated with the fact that respondent-mother did not believe MK had been abused. Dr. Henry opined that returning MK to respondent-mother's care would exacerbate her current issues, including further deterioration of her mental health and the likelihood of self-harm.

Cynthia Bridgman also testified as an expert in child psychology; she had provided MK with individual therapy since June 2020. Bridgman stated that MK presented with extreme hypervigilance, parentification, night terrors, depression, suicidal ideation, and experiences of guilt and responsibility for things that were not her fault. Bridgman stated that MK had reported that she had suffered physical abuse and sexual abuse by several different perpetrators, and she witnessed domestic violence and substance abuse. Bridgman also testified that respondent-mother's disbelief had significantly harmed MK, and that MK was afraid to return to respondent-mother's care because she feared retaliation and further abuse and neglect. Bridgman also testified that respondent-mother's continued association with one of MK's abusers was a source of continuing trauma.

Respondent-mother's individual therapist, Rachel Hooley, testified that respondent-mother found several of MK's allegations "confusing," and opined that it would be more harmful than helpful to force MK to have a relationship with respondent-mother. Respondent-mother's psychological evaluation by Dr. Randall Haugen, Ph.D., was provided to the trial court. Dr. Haugen noted in his evaluation that respondent-mother did not believe MK's allegations because " '[e]ach guy took a lie detector test to prove they didn't do anything and they passed.' " Dr. Haugen opined that reunification with MK was not likely to be successful.

Respondent-mother testified, denying that any domestic violence had occurred in her home. She testified that she did not "know what to believe" regarding MK's allegations because "they took lie detector tests." She also denied ever leaving MK alone with one her alleged abusers, who was a registered sex offender. Respondent-mother denied currently associating with one of MK's alleged abusers, although she admitted to letting him use her car previously.

-2-

The trial court gave an oral opinion concerning the petition to terminate respondent-mother's rights to MK in May 2022. The trial court listed the numerous services that had been provided to respondent-mother and MK, and found that those services were reasonable. The trial court found that respondent-mother continued to have contact with one of MK's alleged abusers and had "varying degrees of belief" about MK's allegations. The trial court found that respondent-mother had not benefitted from the services provided to her:

> Despite all of the services offered to respondent mother and even some of the progress respondent mother has made in addressing her own trauma, respondent mother has not fully acknowledged her failure to protect [MK] nor benefitted from the services offered to her to the extent that would be necessary so that she could provide the support and care [MK] needs to continue to process her sexual abuse and ultimately heal.

The trial court noted that respondent-mother had concluded that several of MK's allegations were untrue simply because the men accused had passed a polygraph. Further, respondent-mother had continually minimized MK's allegations despite the fact that the trial court found during the adjudication phase that MK had been sexually abused.

The trial court found that statutory grounds for termination of respondent's parental rights under MCL 712A.19b(3)(b), (c)(*i*), (c)(*ii*), (g), (j), and (k) had been proven by clear and convincing evidence, and that termination was in MK's best interests. This appeal followed.

## II.  REASONABLE EFFORTS

Respondent-mother argues that the trial court clearly erred when it found that DHHS made reasonable efforts to reunify her with MK. We disagree. This Court reviews de novo whether the trial court properly interpreted and applied the relevant statutes and court rules. See *In re Ferranti*, 504 Mich 1, 14; 934 NW2d 610 (2019). Whether the lower court proceedings complied with due process is also a question of law that the court reviews de novo. *Id*. This Court reviews a trial court's findings for clear error. See *In re Gonzales/Martinez*, 310 Mich App 426, 430; 871 NW2d 868 (2015). A trial court's finding is clearly erroneous when, on the entire evidence, this Court has the definite and firm conviction that the trial court made a mistake. *Id*. at 430-431.

On appeal, respondent-mother does not argue that the trial court clearly erred when it found that DHHS had established grounds to terminate her parental rights under MCL 712A.19b(3)(b), (c)(*i*), (c)(*ii*), (g), (j), and (k). See *In re JS & SM*, 231 Mich App 92, 98-99; 585 NW2d 326 (1998), overruled in part on other grounds *In re Trejo*, 462 Mich 341; 612 NW2d 407 (2000). Rather, respondent-mother only argues that termination was improper because the trial court found that petitioner had made reasonable efforts to reunify her with MK. More specifically, she argues that the trial court could not find that petitioner's efforts were reasonable when petitioner had failed to provide parenting time. We disagree.

Petitioner had the obligation to make reasonable efforts to reunify respondent-mother with MK before seeking the termination of respondent-mother's parental rights. See *In re Hicks*, 500 Mich 79, 85; 893 NW2d 637 (2017); see also MCL 712A.18f(3)(b); MCL 712A.19a(2). For that reason, petitioner had to establish a case service plan that included a schedule of services to be

provided to respondent-mother to facilitate the return of MK to her care. See *Hicks*, 500 Mich at 85-86. Petitioner was further obligated to provide respondent-mother with reasonable time to make changes and benefit from the plan. See *In re Mason*, 486 Mich 142, 159; 782 NW2d 747 (2010).

There is no dispute that petitioner provided respondent-mother with numerous services designed to rectify the problems that led to the adjudication in this case, including psychological evaluations for both respondent-mother and MK, and individual therapy. Respondent-mother argues, however, that petitioner's efforts were necessarily not reasonable because the services offered did not include parenting time. Normally, a parent also has the right to regular and frequent parenting time before adjudication. See MCL 712A.13a(13). However, if "the court determines that parenting time, even if supervised, may be harmful to the juvenile's life, physical health, or mental wellbeing, the court may suspend parenting time until the risk of harm no longer exists." MCL 712A.13a(13); see also MCR 3.965(C)(7)(a) (stating that the trial court should permit parenting time unless parenting time, even if supervised, may be harmful to the child). Moreover, the court "may order the juvenile to have a psychological evaluation or counseling, or both, to determine the appropriateness and the conditions of parenting time." MCL 712A.13a(13); see also *In re Ott*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 362073); slip op at 6-8 (holding that a parent has the right to parenting time unless the court finds that it would be harmful).

In this case, there was overwhelming evidence that parenting time would have been harmful to MK, and would not have been successful had it been ordered before respondent-mother and MK were in a position to benefit from it. Dr. Henry, for example, reported that MK had suffered complex trauma and that she associated that trauma with respondent-mother. He stated that MK had an insecure attachment to respondent-mother as early as 2011, and that that bond only worsened over the eight years in which MK had been left in respondent-mother's care. Dr. Henry also specifically rejected the contention that reunification therapy was appropriate, noting respondent-mother's history of refusing to believe MK and failing to support or protect MK. He stated that supervised visits with respondent-mother when respondent-mother was not yet capable of supporting MK would have no value. He further stated that respondent-mother's refusal to believe MK's reports of sexual abuse by men with whom respondent-mother associated had been psychologically devastating to MK.

Bridgman similarly opined that respondent-mother's lack of belief had been more harmful to MK than the abuse itself. She explained that MK feared retaliation from respondent-mother and feared the loss of her current support system. Bridgman testified that MK experienced extreme fear and dysregulation whenever she saw respondent-mother. She further stated that respondent-mother's inability to believe MK prevented MK from healing.

Even Hooley, respondent-mother's own therapist, opined that it would be more harmful than helpful to force MK to have a relationship with respondent-mother when MK was not yet ready. She agreed that it would also be harmful to MK for respondent-mother to continue to associate with a man whom MK believed sexually abused her, and there was evidence to support a finding that respondent-mother had in fact continued to associate with him. And, in his psychological assessment of respondent-mother, Dr. Haugen opined that reunification was

unlikely to be successful and stated that it was likely that respondent-mother would engage in power struggles with MK, which would result in more acting out and more conflicts between them.

In sum, there was strong evidence that, had petitioner provided respondent-mother with parenting time—even if supervised and therapeutic—the forced meetings would have been harmful to MK at the time of the proceedings below. Instead, petitioner provided both respondent-mother and MK with evaluations intended to identify their mental-health needs and then provided them with counseling to help them both meet those needs. Given the extreme trauma that MK suffered while under her respondent-mother's care, it was reasonable for petitioner to order the assessments and provide both respondent-mother and MK with therapy that would allow them to engage in therapeutic parenting time at some point in the future, if they both benefited from the services. Unfortunately, the evidence showed that respondent-mother did not sufficiently benefit from counseling to allow her to safely engage in therapeutic parenting time with MK. Respondent-mother continued to doubt the veracity of MK's allegations against the men with whom respondent-mother associated. Respondent-mother's own testimony showed that she still doubted MK, that she lacked insight into the dynamics involved with sexual abuse, and that she had not progressed to a point in her own treatment that would allow her to parent MK. Respondent-mother's continued doubts about MK and her lack of insight directly implicated her ability to be supportive to MK and to help her heal. Indeed, as Dr. Haugen and Hooley both stated, respondent-mother was likely to harm her relationship with MK further if MK were forced to engage in reunification therapy with respondent-mother before they were both ready to do so.

Whether petitioner made reasonable efforts is a factor to consider when determining whether the evidence supports terminating a parent's parental rights. See *In re Rood*, 483 Mich 73, 89; 763 NW2d 587 (2009) (opinion by CORRIGAN, J.); see also *id*. at 123-124 (opinion by CAVANAGH, J.). In this case, petitioner provided both respondent-mother and MK with mental-health services (among other services) that were designed to identify their areas of need and help them reach a point at which respondent-mother could reunify with MK; however, respondent-mother did not sufficiently benefit from those services to allow parenting time. See *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012) (stating that a parent has an obligation to participate in and benefit from the provision of services). Additionally, MK continued to reject her mother and had not herself reached a point at which she could engage with respondent-mother in a healthy way. Under these circumstances, the trial court did not clearly err when it found that petitioner had made reasonable efforts to rectify the conditions that led to the adjudication and reunify respondent-mother with MK. See *In re Gonzales/Martinez*, 310 Mich App at 430-431.

III. BEST-INTEREST

Respondent-mother also argues that the trial court clearly erred when it found that termination was in MK's best interests. This Court reviews the trial court's factual findings underlying its application of the law for clear error. See *id*. at 430. A finding is clearly erroneous when this Court is left with the definite and firm conviction that a mistake has been made. *Id*. at 430-431.

Once a trial court finds that a statutory ground for termination has been established by clear and convincing evidence, the "court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made," if the court further

finds that "termination of parental rights is in the child's best interests." MCL 712A.19b(5). When considering the child's best interests, the court should consider a variety of factors:

> The trial court should weigh all the evidence available to determine the children's best interests. To determine whether termination of parental rights is in a child's best interests, the court should consider a wide variety of factors that may include the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. [*In re White*, 303 Mich App 701, 713-714; 846 NW2d 61 (2014) (quotation marks and citation omitted).]

In making a best-interest determination, the trial court's focus is on the child—not the parent. See *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016). The trial court must also explicitly address the fact that the child has been placed with relatives when determining whether termination is in the child's best interests. *Id*.

In this case, the trial court found that termination was in MK's best interests because she needed permanency, and MK could not have a healthy relationship with respondent-mother until they both made further progress in their healing. The court further found that it was unlikely that respondent-mother would benefit from services within a sufficient time to begin reunification; more specifically, the trial court found that MK, then aged fifteen, would likely be an adult before respondent-mother showed adequate benefit. The court recognized that MK had been placed with her maternal aunt, but it still concluded that that did not preclude termination; the court explained that MK's need for permanency was necessary to allow her to heal, and there was no more time to wait for respondent-mother. The trial court's findings were fully supported by the record.

Respondent-mother argues that the trial court did not consider all of the relevant factors implicating MK's best interests and instead focused on MK's mental status. The trial court was not required to examine at length each and every factor of potential relevance to MK's best interests in its analysis. See MCR 3.977(I)(1) ("Brief, definite, and pertinent findings and conclusions on contested matters are sufficient.") Rather, the trial court only had the obligation to find whether termination of respondent-mother's parental rights was in MK's best interests on the whole record. See *In re Trejo*, 462 Mich at 356.

The trial court focused on the evidence that MK had suffered severe trauma arising from respondent-mother's repeated failure to protect MK from sexual abuse, and continued to suffer from the effects of that trauma. There was also evidence that MK would likely suffer additional trauma if returned to respondent-mother's care because respondent-mother lacked insight into sexual-abuse dynamics, continued to question MK's veracity, remained in contact with a man whom MK accused of sexual abuse, and lacked the skills to support MK and help her heal. Because the nature and extent of MK's trauma and respondent-mother's willingness and ability to help MK heal from that trauma were the primary contested matters, the trial court did not err when it focused on those factors when making its best-interest determination.

Respondent-mother also argues that the trial court should have considered that respondent-mother compliance with her service plan and improvements in parenting skills regarding her other daughter, IG. But the trial court had an obligation to separately consider MK's best interests, see *In re White*, 303 Mich App at 715, and the improvements that respondent-mother may have demonstrated in her parenting of IG did not indicate that she could also meet MK's complex needs. Instead, the evidence tended to show that respondent-mother would likely continue to expose MK to risky men and would further traumatize her by suggesting that she was not worthy of belief or protection. Moreover, and contrary to respondent-mother's argument, the trial court did address her compliance with the case service plan; specifically, it found that, although she participated in the plan, she did not adequately benefit from the services that petitioner had provided. Because that finding was supported by the evidence, we are not left with the definite and firm conviction that the trial court erred. See *Gonzales/Martinez*, 310 Mich App at 430-431.

Respondent-mother argues that the trial court should have considered that petitioner destroyed her bond with MK by denying her parenting time. The record does not support respondent-mother's argument. The record shows that respondent-mother had already demonstrably weakened the bond that she had with MK by 2011 and that respondent-mother further damaged it over the eight years leading to the most recent removal. There was also strong evidence that respondent-mother continued to undermine MK's effort to recover from trauma whenever they interacted. The record shows that respondent-mother was primarily responsible for the lack of bond between her and MK.

Respondent-mother also argues that the trial court should have considered a guardianship as an alternative to termination. Generally, placement with a relative weighs against termination. See *id*. at 434. However, a trial court is not precluded from finding that termination is in a child's best interests merely because that child is placed with a relative. *Id*. In this case, MK had been placed with her maternal aunt, and the evidence showed that her aunt had been providing MK with the love, compassion, support, and understanding that MK needed to heal. MK's aunt and uncle were also willing to adopt MK. The record showed that MK feared being returned to her mother's care and felt that she was in limbo while respondent-mother still had the potential to assert her parental rights. Dr. Henry opined that a guardianship would not provide the permanence that MK needed to heal. There was also evidence that respondent-mother continued to have contact with one of MK's abusers and had not benefited from services sufficient to conclude that she no longer posed a danger to MK's well-being. See *id*. at 435 (noting that the mother's continued contact with the child's abuser and lack of progress supported a finding that termination was in the child's best interests). Considering these facts, the trial court did not clearly err when it found that MK's need for permanence outweighed respondent-mother's suggestion of a guardianship as an alternative to termination. See *id*. at 430-431.

The trial court did not clearly err when it found that termination was in MK's best interests. See *In re Trejo*, 462 Mich at 356.

## IV. APPOINTMENT OF EXPERT

Respondent-mother also argues that the trial court should have appointed an expert on child trauma to help her with her defense to the petition. Respondent-mother concedes that she never requested the appointment of an expert at state expense; therefore, this issue is unpreserved and

reviewed for plain error. See *In re Utrera*, 281 Mich App 1, 8-9; 761 NW2d 253 (2008). We find that no plain error occurred.

A parent may, consistent with the requirements of due process, be entitled to have the state pay for an expert to assist in a termination of parental rights proceeding upon request. See *In re Yarbrough Minors*, 314 Mich App 111, 134, 137-138; 885 NW2d 878 (2016). However, because this issue is unpreserved, respondent-mother has the burden to show that, but for the failure to appoint an expert to assist her defense, the outcome of the termination hearing would have been different. See *In re Beers*, 325 Mich App 653, 677; 926 NW2d 832 (2018).

Respondent-mother argues that a "a contrarian expert" was essential to rebut the testimony of petitioner's experts regarding the trauma that MK had suffered and the likelihood that respondent-mother could safely engage in reunification therapy with MK. She has not, however, made any offer of proof to establish that an expert would be ready, willing, and able to give any testimony or insights favorable to respondent-mother. She also has not identified any flaws in the testimonies by the experts who testified in this case, which could have been the subject of cross-examination that might have so undermined their testimonies that the outcome would have been different. Respondent-mother's argument is in essence the assertion that—in retrospect—she might have liked to have had an expert help her, but her belief that an expert might have been helpful is not sufficient to establish a plain, outcome-determinative error. See *id*.

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Mark T. Boonstra
/s/ James Robert Redford

-8-