*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
July 25, 2019

Plaintiff-Appellee / Cross-
Appellant,

v

No. 337860
Calhoun Circuit Court
LC No. 2010-001368-FC

SHAWN DELANO BROWN,

Defendant-Appellant / Cross-
Appellee.

Before: GLEICHER, P.J., and STEPHENS and O'BRIEN, JJ.

GLEICHER, J. (*concurring*).

The prosecution charged Shawn Delano Brown with first-degree felony murder, alleging that he shook his five-month-old son so violently that the child sustained a fatal brain injury. The infant had no bruises or fractures. No one saw Brown assault his child, and Brown had no history of mistreating the boy. The medical examiner noted a few superficial scalp scratches but conceded that they "could be treatment injuries." The prosecution's case rested on expert testimony supplied by five physicians: an emergency medicine specialist, a forensic pathologist, an ophthalmologist, a neurosurgeon, and a specialist in pediatric critical care.

The defense did not have an expert witness. Defense counsel moved for funds for an expert, but the motion was denied. The jury convicted Brown of voluntary manslaughter and second-degree child abuse.

The lead opinion holds that Brown was deprived of his right to the effective assistance of counsel arising from counsel's failure to justify adequately his request for expert witness funding, and I concur. The court's improper exclusion of an audiotape of Brown's police interview also constitutes ineffective assistance and merits a new trial. Yet another ground supports a new trial—the trial court abused its discretion by denying counsel's motion for expert witness funds, despite the motion's deficiencies.

-1-

# I

To his credit, defense counsel moved for funds to retain an expert witness. But he filed the motion only three weeks before the trial date and failed to cite any caselaw or to raise any legal arguments. Counsel advised the court that he had been retained by Brown's friends and family, that they had stopped paying him, and that they could not afford to pay an expert. He asserted that he had traveled to Kentucky at his own expense to consult with a "close friend," a vascular surgeon, "to gain assistance with cross examination." Counsel disclosed that he had not yet obtained all of the child's medical records and admitted that his "preparation is less than adequate to defend against the People's experts."

At the motion hearing, counsel explained that his vascular surgeon friend was "not the type of expert . . . we're seeking," and that he had met with "a couple of other forensic pathologists but no one has looked at the case." One of the physicians he consulted, Dr. Laurence Simson, had agreed to review it. Counsel requested $3,000 to pay Dr. Simson's fee. Remarkably (and to *his* credit), the prosecuting attorney pointed out to the judge, "[I]f there is a conviction and no expert is appointed there is a guaranteed appellate issue involved." Even so, the prosecutor urged the judge to deny the motion, arguing that because the medical examiner determined that "the trauma . . . occurred solely while Mr. Brown had possession of the child . . . . I don't know what, if anything, Doctor [Simson] would add[.]" Defense counsel proposed that "the child may have had pneumonia which in fact would cause brain swelling and if that's the cause of death that may . . . present some issues and . . . for that reason we need Doctor [Simson] emphatically to examine this and testify in the case."

The lead opinion maintains that the trial court denied defense counsel's motion for two reasons: its untimeliness and counsel's failure to show that Simson's testimony would be helpful. I agree that the trial court invoked those grounds for its decision. But the court wove another reason into its ruling—that Brown had retained counsel. Here is the entirety of the court's ruling:

> I've been doing this for nearly 18 years on the Circuit bench and 28 as a judge and I don't think I've ever had a situation where a retained attorney has come in requesting the People of Calhoun County to incur expense involved for the investigation on the defendant's behalf. You're right. I've never had that that I'm aware of, it's never happened and it strikes me in reviewing these – in reviewing your motion but in reviewing the court file and looking at the initial complaint that was filed in this case that clearly the defendant knew – everyone knew – going in that this case was going to involve experts and a number of experts as it relates to the cause of death of this young child, so no one walked in here knowing – I don't – there's no one – and the defense isn't coming in here today saying I'm surprised, I never anticipated this, I couldn't have possibly known that the case would turn the way it did and it would require experts and what-have-you. Everyone knew, including the defendant quite frankly, going in that that was a possibility that – the need for expert testimony and that causes me some concern, quite frankly, right from the get go.

Secondly, even from what's presented to me here today what I'm hearing is I need some funds because I think, maybe, Doctor [Simson] might be able to help me in my defense and even in a court appointed setting I don't think that that would necessarily be sufficient to justify the appointment of – or the funds being expended to find out essentially whether that's going to be needed or not. I'm – I mean there's case law to the effect that a defendant must demonstrate something more than a mere possibility of assistance from requested expert. Due process does not require the government automatically to provide indigent defendants with expert assistance upon demand. The – and I'm reading from [*People v Leonard*, 224 Mich App 569; 569 NW2d 663 (1997)].

The bottom line here is the defendant retained counsel several months back, the defendant and everyone knew just based on the pleadings that's been presented that in doing so that that counsel may very well need assistance of expert witnesses along the way in order to present a defense, may or may not, but may need that. *He knew that going in and nonetheless chose to have – retain a counsel and to proceed with retaining counsel and to this point and that being the case I'm not convinced that it's required of the Court to enter an order obligating the County of Calhoun to expend funds for this purpose* and prosecution, prepare an order to that effect. I'm going to deny the motion. [Emphasis added.]

The lead opinion rejects that counsel's retained status played any role in the court's ruling. I interpret the words differently. "The bottom line," the court emphasized, was that Brown "chose to . . . retain counsel and to proceed with retaining counsel." The trial court closed by declaring that it would not "obligat[e] the County of Calhoun to expend funds for this purpose[.]" In my view, the court denied Brown's motion both because Brown had retained counsel and because counsel failed to provide a good reason for the expenditure of county funds. Judge Lincoln, who conducted the *Ginther* hearing, reached a similar conclusion: "Judge Garbrecht denied Defendant's request both because [counsel] had been retained knowing that the case would involve experts and because Defendant failed to demonstrate anything more than a mere possibility of assistance from an expert."

None of the grounds cited by the trial court supported its denial of expert funds, because Brown's indigence entitled him to a court-funded expert witness and, without an expert, he could not defend against the prosecution's case. Although his family and friends had raised enough money to hire a lawyer, *Brown* was indigent. Indeed, the family and friends had also run out of money for Brown's defense. Brown's counsel repeatedly stressed these unchallenged facts to the court. Brown's request for funds should have been considered in that context.

It was obvious to defense counsel, the prosecutor, and the court that the jury's verdict would hinge on the testimony of experts. The prosecution's case hinged on two interrelated claims: (1) that the only reasonable medical explanation for the child's severe injuries was trauma deliberately inflicted by Brown, and (2) that the timing of the injury limited the possible perpetrators to Brown. Other than denying that he hurt his child, Brown had no defense. For the reasons detailed in *People v Kennedy*, 502 Mich 206, 213-228; 917 NW2d 355 (2018), the Fourteenth Amendment's due process clause obligated the trial court to consider whether there existed " 'a reasonable probability both that an expert would be of assistance to the defense and

-3-

that denial of expert assistance would result in a fundamentally unfair trial.' " *Id*. at 228, quoting *Moore v Kemp*, 809 F2d 702, 712 (CA 11, 1987). These considerations did not enter into the trial court's thinking, despite the prosecutor's explicit warning that denial of the motion "guaranteed" an "appellate issue."

*Kennedy* was decided in 2018, and these events occurred in 2010. The timing is legally irrelevant, contrary to the lead opinion's intimation. *Kennedy* overruled *People v Tanner*, 469 Mich 437, 442-443; 671 NW2d 728 (2003), in which the Supreme Court had held that a court did not have to provide funds for the appointment of an expert unless the defendant demonstrated a "nexus" between the case facts and the need for expert assistance. *Kennedy* held that the correct approach to expert funding issues derives from *Ake v Oklahoma*, 470 US 68; 105 S Ct 1087; 84 L Ed 2d 53 (1985). In *Ake*, 470 US at 76, the United States Supreme Court began its analysis by restating a proposition deeply embedded in our constitutional jurisprudence:

> This Court has long recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense. This elementary principle, grounded in significant part on the Fourteenth Amendment's due process guarantee of fundamental fairness, derives from the belief that justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake.

The Supreme Court then reviewed cases in which it had compelled the states to fund certain legal tools required by indigent defendants, including appellate filing fees and transcripts. "Meaningful access to justice has been the consistent theme of these cases," the Court explained. *Id*. at 77. Although the state need not duplicate the resources available to wealthy defendants, "a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense." *Id*.

*Ake*, decided in 1985, governed Brown's 2010 request for expert funding. Basic legal research would have disclosed that *Ake* provided a formidable legal argument in favor of funding.[1] But even if Brown's counsel should not have been expected to formulate such an argument given *Tanner*, *Kennedy* controls the outcome here. In *Griffith v Kentucky*, 479 US 314, 328; 107 S Ct 708; 93 L Ed 2d 649 (1987), the United States Supreme Court held that "a new rule for the conduct of criminal prosecutions . . . applie[s] retroactively to all cases, state or

---

[1]Although *Ake* involved funding for a psychiatric expert, before 2010, a number of courts had applied *Ake*'s reasoning to a defendant's requests for expert assistance in areas other than psychiatry. For a list and summary of the cases, see Giannelli, *Ake v. Oklahoma: The Right to Expert Assistance in a Post-Daubert, Post-DNA World*, 89 Cornell L Rev 1305, 1367-1368 (2004), and *Moore v State*, 390 Md 343, 364; 889 A2d 325 (2005) ("The majority of courts have concluded that *Ake* extends beyond psychiatric experts.").

federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." See also *People v Sexton*, 458 Mich 43, 55; 580 NW2d 404 (1998). This case was pending on direct appeal in 2018, when *Kennedy* was issued.

All of the trial court's reasons for denying Brown's request for funding lacked legal merit. And an expert in a relevant medical specialty would have been able to provide critical assistance to the defense. Without that help, Brown's counsel had no effective means of cross-examining the prosecution's experts or of developing his own defensive strategy.

In cases involving the complicated and evolving science underlying a diagnosis of pediatric abusive head trauma, expert testimony "[is] not only integral to the prosecution's ability to supply a narrative of the defendant's guilt, it [is] likewise integral to the defendant's ability to counter that narrative and supply his own." *People v Ackley*, 497 Mich 381, 397; 870 NW2d 858 (2015). The prosecution's reliance on expert testimony should have signaled to the trial court that expert testimony was a prerequisite to conviction. It should have signaled the converse as well: that the only way Brown could level the playing field in a case dependent on expert testimony was to have one of his own. Denying Brown the ability to retain an expert deprived him of any opportunity for a fair trial.

II

The lead opinion details the half-hearted effort made by defense counsel to engage or consult with a relevant expert, summarizing that his "failure to identify and consult with an expert to support the defendant's theory of the case made him unprepared to seek medical expert funds from the court." I agree. I would add that counsel waited until the last possible moment to *begin* any meaningful preparation in this case. His motion for expert funding should have been made as soon he undertook representation, because he knew that "there was controversy brewing in the medical field about shaken baby at that time." A lawyer performing reasonably would have presented information concerning that scientific dispute at the earliest possible opportunity.

The dissent, on the other hand, posits that counsel was not ineffective because he consulted with "two local experts . . . who both told him that they agreed with the prosecution's expert," was "versed in the technical subject matter critical to the case," and elicited testimony from one of the prosecution's witnesses, Dr. Beck, that "was helpful to his client's case." Respectfully, I find no support for any of these propositions in the record.

Defense counsel consulted with one potential expert witness other than his friend in Kentucky: Dr. Simson. Counsel's decision to consult with Dr. Simson was itself evidence of counsel's ineffectiveness, in my view. In his affidavit, counsel admitted that when he received an invoice from Dr. Simson for expert fees, "Dr. Simson informed me . . . that he had previously worked with the prosecution's lead expert witness, Dr. Joyce DeJong, and thus was inclined to agree with her. I realized at that point that Dr. Simson would not be useful as a defense witness even if Mr. Brown could afford to pay his fee due to his personal connection to Dr. DeJong. This knowledge came only three days before the trial was set to begin."

-5-

Counsel's negligent delay in obtaining this information from Dr. Simson, coupled with his lackadaisical approach to preparing for trial, exemplify ineffective practice. Had counsel shared with Dr. Simson that Dr. DeJong had performed the autopsy and concluded that the child's death was due to abusive head trauma, he would have gleaned that any consultation with Dr. Simson would be worthless. He also would have learned (as he revealed at the *Ginther* hearing) that Dr. Simson "was the mentor of Dr. DeJong[.]" Counsel wasted his time and his money. Nothing about this consultation with Dr. Simson supports that counsel performed effectively by engaging in it.[2]

The dissent's claim that counsel was "versed" in the technical aspects of the case also lacks support in the record. Counsel was able to read the words in the medical records, but his knowledge beyond that is indiscernible. That harsh conclusion is not mine; it comes from counsel himself, who stated in his affidavit, "I tried to do my own research on Shaken Baby Syndrome, and use that to cross-examine the prosecution's experts. However, as a non-scientist and without an expert at my side, I was simply baffled by the medical testimony. I believe my lack of understanding greatly hampered my cross-examinations." Yet according to the dissent, counsel managed to elicit "helpful" testimony from Dr. Beck. I read the cross-examination differently.

During the prosecutor's direct examination, Dr. Beck solidified his position that this was a case of abusive head trauma. After outlining the results of Dr. DeJong's autopsy, the prosecutor asked Dr. Beck if he was "comfortable" opining whether the child "was abused in some form or fashion." Dr. Beck responded in relevant part, "The pathological findings you describe are consistent with my clinical exam and I would have documented this as abusive head trauma or non-accidental trauma." One transcript page later, the prosecutor asked essentially the same question and got the same answer:

> *Q.* Once again, is your opinion that this was some type of abusive trauma brain injury consistent with what you saw and what you know, Doctor?
>
> *A.* It is.

The prosecutor then asked whether Brown's version of his actions (that the child developed problems breathing and choking when he "patted" the child's back) could have caused the injuries, and Dr. Beck answered succinctly, "No, they would not."

On cross-examination, defense counsel questioned Dr. Beck about the child's pneumonia, implying that it explained the child's injuries. Dr. Beck made clear that the pneumonia was a consequence, rather than a cause, of the brain injury. He summarized, "I can be firm in my

---

[2] Contrary to the dissent's statement that the experts with whom counsel consulted "told him that they agreed with the prosecution's expert," counsel testified regarding Dr. Simson: "But it turned out Doctor Simson told me that he couldn't testify against Dr. DeJong. Or wouldn't want to or feel comfortable about it. And supported her." Given that Dr. Simson was Dr. DeJong's "mentor," his support for her was a foregone conclusion.

belief that the sequence of events, that cascade, was brain injury, pulmonary edema, secondary to the brain injury, respiratory arrest, cardiac arrest, resuscitation." Once again, Dr. Beck vigorously rejected any suggestion that the child's injuries had a cause other than head trauma. Counsel made a limited attempt to question Dr. Beck about the controversy in the medical community regarding abusive head trauma. Dr. Beck characterized the questions as "an argument . . . put out" by a "community." He did not bestow that "argument" with any credence.

Perhaps the dissent can identify an isolated point or two scored by counsel during his long cross-examination of Dr. Beck. I did not find any. Counsel asked a handful of good questions, but he got no good answers. And as the jury was instructed at the end of the trial, counsel's questions were not evidence they could use in deciding the case. Cross-examination, no matter how skilled or effective, is not a substitute for the testimony of an expert witness. While counsel's trip to the medical library was a good idea, "it is simply unrealistic to expect that such concerted study will yield the experience necessary . . . to effectively cross-examine an adversary expert witness steeped in years of medical training, knowledge, and experience. *In re Yarbrough Minors,* 314 Mich App 111, 132; 885 NW2d 878 (2016).

Counsel's efforts to find and fund expert testimony were too little, and too late. Despite realizing that cases involving abusive head trauma presented issues on the cutting-edge of science and law, counsel failed to contact other lawyers who actually were "versed" in this special area of defense. Counsel conducted a first-degree murder trial without the basic tools he needed to perform adequately. I concur with the lead opinion's conclusion that defense counsel performed ineffectively, and that his ineffectiveness prejudiced Brown.

/s/ Elizabeth L. Gleicher