*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re TUCKER/PREWITT/GRAY, Minors.

UNPUBLISHED
December 09, 2025
11:31 AM

No. 374401
Kalamazoo Circuit Court
Family Division
LC No. 2021-000210-NA

In re PREWITT/GRAY, Minors.

No. 374404
Kalamazoo Circuit Court
Family Division
LC No. 2021-000210-NA

Before: M. J. KELLY, P.J., and REDFORD and FEENEY, JJ.

PER CURIAM.

In these consolidated cases,[1] respondents appeal by right the trial court's order terminating their parental rights to their children. In Docket No. 374401, respondent-mother appeals of right the order terminating her parental rights to the minor children JT,[2] AP, WP, MG, and BG under MCL 712A.19b(3)(c)(*i*), MCL 712A.19b(3)(c)(*ii*), MCL 712A.19b(3)(g), and MCL 712A.19b(3)(j). In Docket No. 374404, respondent-father appeals by right the same order terminating his parental rights to WP, AP, MG, and BG. For the reasons stated herein, we affirm.

## I. BASIC FACTS

This case began in 2021, when the Department of Health and Human Services petitioned the trial court to exercise jurisdiction over JT, WP, and AP on the basis of concerns that

---

[1] *In re Tucker/Prewitt/Gray Minors*; *In re Prewitt/Gray Minors*, unpublished order of the Court of Appeals, entered February 18, 2025 (Docket Nos. 374401 and 374404).

[2] The trial court terminated the parental rights of JT's legal father in an earlier, separate order. He is not part of this appeal.

-1-

respondents were not providing proper care for WP's Type 1 diabetes. Respondent-father had taken WP to the emergency room because he could not lower the child's dangerously high blood-sugar level to a reasonable level. Respondent-father blamed respondent-mother for WP's high blood-sugar level, and the hospital was concerned that WP's diabetes was not being managed properly. Thereafter, someone reported concerns about respondent-mother's substance use to Children's Protective Services (CPS). In response, a CPS worker went to respondents' home and observed respondents exhibiting emotionally erratic behavior. Respondents admitted that they used cannabis. Respondent-mother denied using methamphetamine, but reported that respondent-father had a history of methamphetamine use. Respondent-father could not remember the last time that he had used methamphetamine.

The Department alleged that the home where the children were living was without power; that the insulin required to treat WP's diabetes required refrigeration; and that none of the children had verifiable, routine, pediatric medical care. Respondents would not allow CPS to verify the home's condition nor would they complete drug screens. On the basis of these allegations, the Department asked the trial court to authorize the petition and order respondents to cooperate with CPS's investigation by allowing CPS access to their home and by completing a drug screen. After a preliminary hearing, the trial court authorized the petition, allowing the children to remain with respondent-mother. The court ordered respondents to, among other things, give caseworkers, service providers, and the guardian ad litem access to the home and comply with random drug screens.

Less than a week later, the Department amended the petition to request removal of the children from respondents' home because respondents refused to cooperate with CPS's investigation, and the investigator could not ensure the children's safety. The court authorized the petition, allowed respondents supervised parenting time, and set a pretrial conference and adjudication dates. The children were placed in two nonrelative, licensed foster-care homes, with JT and AP together in one home, and WP, MG, and BG together in another home.

At the pretrial conference, respondent-mother's newly retained lawyer asked for an adjournment to allow time for him to review the file. All parties agreed to the adjournment, to reschedule the adjudication, and to waive the time line requirement for adjudication. The matter was scheduled for the next available pretrial date. Subsequently, the Department amended the petition to reflect a recent positive test for methamphetamine. When respondent-mother gave birth to twins, MG and BG, the Department amended its petition again to seek their removal on grounds that their meconiums tested positive for amphetamine, methamphetamine, and tetrahydrocannabinol (THC).

Approximately six months after the twins' birth, respondents impermissibly absconded with JT and AP from their placement. Law enforcement found respondents and the children the next morning. The children were returned to their placement, and respondents were arrested and charged with parental kidnapping. Parenting time was suspended until it could be determined how to prevent a similar incident from recurring; the suspension lasted approximately four months. After a safety plan was put in place and the suspension lifted, respondents did not schedule parenting time for three additional months for fear of being arrested on outstanding warrants.

After several postponements, respondents' adjudication occurred in February 2023. The trial court adjudicated respondent-mother as unfit on the basis of substance abuse, involvement in parental kidnapping, and medical neglect. The court adjudicated respondent-father as unfit on the basis of parental kidnapping and neglect. Respondents' caseworker testified at the initial dispositional hearing that respondents refused to go over their treatment plan. Rather, they proposed to write their own treatment plan for services that might benefit them. Respondent-father saw a need for anger-management classes and family therapy. Respondents never wrote their own treatment plan, though, and respondent-father never attend anger-management classes. At the end of the disposition hearing, the trial court instructed the agency to give respondents information regarding the children's medical issues and appointments. The court ordered respondents to (1) cooperate with psychological evaluations and substance-abuse assessments and to follow their recommendations; (2) undergo random drug screens; (3) participate in parenting classes, parenting time, and recommended counseling; and (4) provide proof of housing and employment. The court also ordered respondent-father to attend anger-management classes.

Although respondents participated in parenting time, they did not see the need for services and failed to consistently engage in them. With respect to parenting time, the trial court found it necessary at various times to issue orders specifying the number of toys, clothes, and books, as well as the amount of food and drink, that respondents could bring, and ordering respondents not to record staff, yell, scream, swear, whisper to the children about the case, or make threatening comments.

In November 2023, having made scant progress toward reunification with the children, respondents left the children in Michigan and moved to Kentucky. The Department continued to work with respondents to help them find services in Kentucky, and the Department arranged for respondents to have supervised, virtual parenting time twice weekly. The children did not have in-person parenting time after respondents moved because respondents could not return to Michigan without risking arrest on outstanding warrants. In March 2024, the Department filed a supplemental petition seeking to terminate respondents' parental rights.

In the Spring of 2024, respondents submitted to seven or eight drug screens in Kentucky, all of which were positive for THC. They completed an online, interactive parenting class approximately six weeks before the start of the termination hearing and took psychological evaluations less than a month before the start of the hearing. By the time of the hearing, respondents reported that they had full-time employment and a fully furnished, two-bedroom trailer, which had yet to be assessed for suitability.

At the termination hearing, the trial court heard testimony from respondents' caseworker and from respondents. Respondents testified that they moved to Kentucky to turn their lives around. They insisted that they had been largely successful, and they asked for more time to address their warrants. After proofs were closed, the termination hearing was adjourned so that the trial court could review the exhibits before delivering its ruling. When the hearing continued, respondent-father was present by Zoom, but respondent-mother, having turned herself in the week before, was in court in another county to address her warrants. Respondent-mother's attorney asked the trial court to delay its ruling until she could be present, at least by Zoom. Because proofs were closed and respondent-mother's presence could make no difference in the proceeding, and the trial court had already waited nearly an hour, the court proceeded with its ruling, finding that

clear and convincing evidence established several statutory grounds under which to terminate respondents' parental rights and finding that termination was in the children's best interests.

Respondents now appeal.

## II. DOCKET NO. 374401

### A. ADJUDICATION

Respondent-mother argues that the trial court clearly erred and violated her right to due process by taking jurisdiction over the children more than 15 months after their removal. Because respondent-mother did not raise this issue in the trial court, it has not been properly preserved for appellate review. See *Peterman v Dep't of Natural Resources*, 446 Mich 177, 183; 521 NW2d 499 (1994). We review unpreserved errors for plain error. *In re Ferranti*, 504 Mich 1, 33; 934 NW2d 610 (2019). To prevail, respondent-mother must establish that "(1) error occurred; (2) the error was plain, i.e., clear or obvious; and (3) the plain error affected [her] substantial rights." *Id*. at 29 (quotation marks and citation omitted). An error is "clear or obvious error" if it is not "subject to reasonable dispute." *In re Baham*, 331 Mich App 737, 745; 954 NW2d 529 (2020) (quotation marks and citation omitted). "[R]eversal is unwarranted unless the error 'substantially affected the fairness, integrity or public reputation of judicial proceedings.' " *Id*., quoting *Ferranti*, 504 Mich at 29.

"In Michigan, child protective proceedings comprise two phases: the adjudicative phase and the dispositional phase." *In re Sanders*, 495 Mich 394, 404; 852 NW2d 524 (2014). The court determines whether to take jurisdiction of the child during the adjudicative phase. *Id*. "The 'fact-finding adjudication of an authorized petition to determine if the minor comes within the jurisdiction of the court' is called the 'trial.' MCR 3.903(A)(27). The term 'trial' includes a 'specific adjudication of a parent's unfitness,' which subjects the parent to 'the dispositional authority of the court.' MCR 3.903(A)(27)." *In re Pederson*, 331 Mich App 445, 464; 951 NW2d 704 (2020). MCR 3.972(A) requires that, if a child is in placement, as were respondents' children, a trial must begin "as soon as possible but not later than 63 days after removal of the child from the home unless the trial is postponed[.]" The trial may be postponed only "(1) on stipulation of the parties for good cause; (2) because process cannot be completed; or (3) because the court finds that the testimony of a presently unavailable witness is needed." MCR 3.972(A). "Good cause" is "a legally sufficient or substantial reason." *In re Utrera*, 281 Mich App 1, 11; 761 NW2d 253 (2008).

There is no dispute that respondent-mother's trial was held 16 months after the older children's removal and nearly a year after the twins' removal. Respondent-mother implies that none of the trial court's postponements of the adjudication met the criteria of MCR 3.972(A) and that she expressed her displeasure with the delay on a number of occasions. The record does not fully support respondent-mother's implications. To be sure, the delay between removal of the children from respondents' care and the adjudication was considerable. However, respondent-mother's assertion to the contrary notwithstanding, some of the postponements met MCR 3.972(A)'s criteria for postponement. The postponement in November 2021 was by stipulation for good cause, see MCR 3.972(A)(1). The postponement in June 2022 was because the "testimony of a presently unavailable witness was needed," MCR 3.972(A)(3). And the

postponement in December 2022 was because process could not be completed, see MCR 3.972(A)(2). Postponements in April 2022 and September 2022 do not appear to fall under MCR 3.972(A)'s exceptions. However, these postponements occurred with respondent-mother's agreement and largely for her benefit. It is well settled that "error requiring reversal may only be predicated on the trial court's actions and not upon alleged error to which the aggrieved party contributed by plan or negligence." *In re Utrera*, 281 Mich App at 11-12 (quotation marks and citation omitted).

Respondent-mother contends that the repeated adjournments made her desperate, and, as a result of her desperation, she absconded with JT and AP. The record does not support this contention. Respondent-mother's comments at the time of the absconding incident did not indicate that she acted out of desperation caused by the delayed adjudication, but because she believed from the outset that the children had been wrongly removed.

Respondent-mother also asserts that repeated postponements of the trial weakened her bond with her children. To the extent that the trial court erred with regard to some of the postponements, respondent-mother agreed to all the postponements. Further, to the extent that the delays may have weakened respondent-mother's bond with the children, she cannot show that the bonds would not have been weakened had the adjudication been timely, given her persistent refusal after adjudication to move toward reunification by participating in and benefiting from services.

Respondent-mother has not articulated how delays in the adjudication resulted in a fundamentally unfair proceeding, particularly since she agreed to all the delays and resisted participation in services after the adjudication.

On this record, we agree that the trial court erred with respect to some of the postponements. However, given that all the postponements occurred with respondent-mother's approval, see *id.*, and considering that respondent-mother has not shown that the trial court's erroneous postponements affected the outcome of the proceeding or resulted in a fundamentally unfair proceeding, the trial court's errors do not require reversal, see *In re Baham*, 331 Mich App at 745.

## B. MOTION FOR CONTINUATION

Respondent-mother next contends that the trial court erred and violated her right to due process by denying her request to adjourn the termination hearing while she was handling a felony matter in another county. We review de novo whether proceedings complied with a respondent's right to due process. *In re Sanders*, 495 Mich at 403-404. And we review for an abuse of discretion a trial court's motion for a continuance. *In re Utrera*, 281 Mich App at 8.

Parents have a fundamental liberty interest in the care, custody, and management of the children. See *Santosky v Kramer*, 455 US 745, 753; 102 S Ct 1388; 71 L Ed 2d 599 (1982); see also *In re Beck*, 488 Mich 6, 11; 793 NW2d 562 (2010). A parent is entitled to the protections of procedural due process if the state seeks to terminate her parental rights. See *In re Rood*, 483 Mich 73, 122; 763 NW2d 587 (2009). However, due process is not a one-size-fits all concept. Rather, it is "flexible and calls for such procedural protections as the particular situation demands." *Mathews v Eldridge*, 424 US 319, 332; 96 S Ct 893; 47 L Ed 2d 18 (1976). This Court has applied

the *Mathews* balancing test in cases involving the termination of parental rights to determine whether a trial court's action violated a respondent's due process rights. See, e.g., *In re Yarbrough Minors*, 314 Mich App 111, 134-135; 885 NW2d 878 (2016).

The *Matthews* framework generally requires consideration of three factors:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the process used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. [*Mathews*, 424 US at 335.]

In the present case, under the first prong of the balancing test, the private interest affected by the trial court's action was respondent-mother's parental rights. Michigan courts accord great respect for parental rights and recognize that "due process requirements in termination cases are much greater than in ordinary civil actions and that such requirements include the parent's right to be represented at the dispositional hearing." *In re Vasquez*, 199 Mich App 44, 46; 501 NW2d 231 (1993) (quotation marks and citation omitted).

Under the second prong, although respondent-mother's interest in her parental rights is a compelling one, the risk of erroneous deprivation was not increased by her absence at the trial court's delivery of its ruling. Proofs were already closed, closing arguments had occurred, respondent-mother was represented at the hearing by her lawyer, and respondent-father was present by Zoom. There was no legal mechanism by which respondent-mother could have affected the court's ruling. Accordingly, the risk of erroneous deprivation was not increased by respondent-mother's absence, nor would it have been decreased by her presence.

As to the third factor, the trial court waited nearly an hour for respondent-mother to appear, either in person or virtually, and there appears to have been no indication when respondent-mother might be available. The court instructed that, should respondent-mother appear in the Zoom waiting room, she should be allowed to join the hearing. Given that neither respondent-mother's presence nor absence would have made a difference to the trial court's ruling, considering that the court rules allow the trial court to deliver its ruling verbally or in writing, and without any indication of when respondent-mother would be available, any additional delay would have added an unwarranted administrative burden.

Notwithstanding the fundamental liberty interest at issue in the termination hearing, because proofs were closed and respondent-mother's presence at the ruling could have no effect on the trial court's ruling, and considering that continuing the termination proceeding until an unknown time would have created an unwarranted administrative burden, we conclude that the trial court did not violate respondent-mother's due-process rights by denying her motion for a continuance.

## III. DOCKET NOS. 374401 AND 374404

### A. STATUTORY GROUNDS

Both respondents argued that the trial court clearly erred by finding that clear and convincing evidence supported a statutory basis for the termination of their parental rights. We review for clear error a trial court's decision that a ground for termination has been proven by clear and convincing evidence and that termination is in the children's best interests. See *In re Trejo Minors*, 462 Mich 341, 356-359; 612 NW2d 407 (2000). See also MCR 3.977(K). A finding is clearly erroneous if, although there is evidence to support it, this Court is left with a "definite and firm conviction" that a mistake was made. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010) (quotation marks and citation omitted). To be clearly erroneous, a decision must be "more than maybe or probably wrong." *In re Sours*, 459 Mich 624, 633; 593 NW2d 520 (1999) (quotation marks and citation omitted). "Further, regard is to be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." *In re Ellis*, 294 Mich App 30, 33; 817 NW2d 111 (2011). "If the trial court did not clearly err by finding one statutory ground existed, then that one ground is sufficient to affirm the termination of the respondent's parental rights." *In re Sanborn*, 337 Mich App 252, 273; 976 NW2d 44 (2021).

The trial court determined that clear and convincing evidence established grounds to terminate respondents' parental rights under MCL 712A.19b(3)(c)(*i*), (3)(c)(*ii*), (3)(g), and 3(j).

MCL 712A.19b(3)(g) supports termination when "the parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age." The focus of MCL 712A.19b(3)(g) is on whether a parent's ability to provide proper care and custody is hamstrung solely by the lack of financial resources. If poverty is the only barrier to providing proper care and custody, then termination under MCL 712A.19b(3)(g) may be inappropriate. See *In re Smith-Taylor*, 339 Mich App 189, 203; 981 NW2d 511 (2021), reversed and remand on other grounds 509 Mich 935 (2022).

The trial court concluded that MCL 712A.19b(3)(g) applied to both respondents. The court impliedly found that economic insecurity was not a barrier to providing proper care and custody of the children, and that there was "no reasonable expectation that respondents would be able to provide proper care and custody within a reasonable time, given the child[ren's] age[s]." MCL 712A.19b(3)(g). The trial court's conclusion is supported by evidence that respondents each worked full-time and earned a combined monthly income of approximately $4,000, and by evidence that, despite the trial court's orders to submit to drug screens, take substance-abuse assessments and follow their recommendations, participate in psychological evaluations and follow their recommendations, and participate in parenting classes, respondents did not fully participate in, or demonstrate benefit from, any of these services. The few drug screens that respondents took after the adjudication were all positive for THC, neither ever took a substance-abuse assessment, and they waited until a month before the termination hearing to take psychological evaluations. Respondent-father expressed a need for anger-management classes. Notwithstanding his caseworker's support and the trial court's order for him to take such classes, respondent-father insisted at the termination hearing that he really did not have an anger-management problem with anyone other than his caseworkers and the agency in Michigan.

Similarly, respondents stated their intentions to come up with a treatment plan that provided the services that they thought they needed. Despite their caseworker's support and multiple attempts to set up a time to work with them, respondents never made themselves available. This pattern echoed respondents' actions during CPS's initial investigation in 2021. They promised initial cooperation, and then they changed their minds and stopped communicating with anyone from the Department.

As to parenting classes, respondents completed a seven-week, online parenting class about six weeks before the termination hearing, but respondent-mother was unable to articulate at the hearing what she had learned from the class. Respondents' caseworker acknowledged at the termination hearing that it was the only parenting class that the Department had asked respondents to take. However, she also indicated that she typically waited until respondents took psychological evaluations so that she could tailor any additional parenting classes to the respondents' needs. Respondents in the present case having delayed in taking their psychological evaluations meant that a foster-care specialist had yet to determine what additional parenting classes might be necessary.

Throughout this case, whether from the effects of substance abuse, mental-health issues, or poor parenting skills, respondents made choices that threatened the emotional well-being of their children. They violated the trial court's placement order and supervised parenting-time order by absconding with JT and AP, causing JT the distress of having to choose between respondents and her placement and possibly contributing to the anxiety attack that JT had while being returned to her placement. As a result of this incident, the court suspended parenting time for approximately five months. Once the suspension was lifted, respondents agreed to the time and place for parenting time. Although the children were gathered and expecting them, respondents failed to show up, fearing arrest on outstanding warrants that they were trying to evade. Respondents did not schedule parenting time with the children for nearly an additional three months. Despite multiple attempts to counsel and guide respondents, respondents persisted in whispering things to the children during parenting time that confused and upset the children, overwhelmed the children with the mass of toys, books, and clothes that they brought to parenting time, attempted to force items on the children that the children did not want, and secretly gave one of the older children a phone. Respondent-father would bring paperwork about diabetes for WP and would then get "heated" and pay more attention to the paperwork than to WP.

In addition, respondents chose to leave their children in Michigan and move to Kentucky, having made but little progress toward reunification in Michigan and knowing that their case would not automatically transfer to Kentucky. Not only did this choice prevent the children from regularly seeing respondents in person, but the fact that both respondents left Michigan without resolving outstanding warrants prevented respondents from coming to Michigan at all without risking arrest. At the time of the termination hearing, it had been nearly a year since the children had seen respondents in person. The trial court implied that respondents' conduct throughout the case showed that they made choices that were best for themselves, without awareness of, understanding of, or concern about the effect of their choices on the children.

At the time of the termination hearing, respondents had yet to address any of these issues in a meaningful way. A parent's failure to participate in, or benefit from, services is strong evidence that the parent will not be able to provide proper care or custody within a reasonable

time.  *In re White*, 303 Mich App 701, 710-711; 846 NW2d 61 (2014).  On this record, we cannot say that the trial court was "more than maybe or probably wrong" by finding that clear and convincing evidence established MCL 712A.19b(c)(g) as a statutory basis for the termination of respondents' parental rights.

Some of these same circumstances established grounds for termination under MCL 712A.19b(3)(j), which supports termination when "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if the child is returned to the home of the parent."  MCL 712A.19b(3)(j) encompasses not just the potential for physical harm, but also the risk of emotional harm.  *In re Hudson*, 294 Mich App 261, 268; 817 NW2d 115 (2011).  "[A] parent's failure to comply with the terms and conditions of his or her service plan is evidence that the child will be harmed if returned to the parent's home."  *In re Kaczkowski*, 325 Mich App 69, 77; 924 NW2d 1 (2018) (quotation marks and citation omitted).

As noted, respondents did not fully participate in, or benefit from, their case service plan, nor did they devise their own case service plan, as they proposed to do, and respondent-father did not attend anger-management classes, despite having said that he needed them and displaying conduct at parenting time that supported his self-assessment.  Respondents' delay in taking psychological evaluations, which prevented the Department from referring them to tailored parenting classes, and respondents' proven record of making decisions that were best for them, without any evidence that they considered the effect their choices would have on the children, suggest that there is a reasonable probability, based upon respondents' conduct, that the children would suffer at least emotional harm if they were returned to respondents.  Therefore, the trial court did not clearly err by determining that clear and convincing evidence established grounds for terminating respondents' parental rights under MCL 712A.19(3)(j).

"If the trial court did not clearly err by finding one statutory ground existed, then [this] one ground is sufficient to affirm the termination of the respondent's parental rights."  *In re Sanborn*, 337 Mich App at 273.  Because we conclude that the trial court did not clearly err by determining that clear and convincing evidence established statutory grounds for the termination of respondent' parental rights under MCL 712A.19b(3)(g) and (3)(j), we need not discuss the trial court's ruling with respect to MCL 712A.19b(3)(c)(*i*) and (3)(c)(*ii*).

## B.  BEST INTERESTS

Respondents next challenge the trial court's finding that the termination of their parental rights was in the children's best interests, arguing that the trial court erred by not considering each child individually.  This Court reviews for clear error "a trial court's determination regarding best interests," *In re Keillor*, 325 Mich App 80, 93; 923 NW2d 617 (2018), as well as "whether the trial court failed to address a significant difference between each child's best interests." *In re White*, 303 Mich App at 716.

In making its best-interest determination, a trial court may consider "the child's bond to the parent[;] the parent's parenting ability[;] the child's need for permanency, stability, and finality[;] and the advantages of a foster home over the parent's home." *In re Gonzales/Martinez*, 310 Mich App 426, 434; 871 NW2d 868 (2015) (quotation marks and citation omitted).  The court may also consider "the parent's compliance with treatment plans, the child's well-being in care,

and the possibility of adoption." *In re Sanborn*, 337 Mich App at 277. In making a best-interest determination, the focus is on the child, not the parent. *In re Atchley*, 341 Mich App 332, 346; 990 NW2d 685 (2022). "[I]f the best interests of the individual children *significantly* differ, the trial court should address those differences when making its determination of the children's best interests." *In re White*, 303 Mich App at 715. The trial court must find by a preponderance of the evidence that termination of parental rights is in a child's best interests. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013).

Respondent-mother does not challenge the trial court's best-interest findings as to JT or AP, and respondent-father does not challenge the trial court's best-interest findings as to AP, MG, or BG. As such, we presume that the trial court did not clearly err by finding that termination was in JT's and AP's best interests as to respondent-mother and that termination was in AP's, MG's, and BG's best interests as to respondent-father. See *In re JS & SM*, 231 Mich App 92, 98-99; 585 NW2d 326 (1998), overruled in part on other grounds *In re Trejo*, 462 Mich 341.

Regarding the twins, a foster-care specialist testified that they were "very bonded" with their foster mother, who provided them the only home they had ever known. WP was the only child who appeared to maintain a bond with respondents. He looked forward to virtual parenting time, and he told the caseworker that he wanted to live both with respondents and with his foster mother; he wanted to stay with his foster mother, but he missed respondents.

The children had been in foster care for three years, some of that time was the result of the trial court's erroneous adjournment and continuation orders. However, the focus at the best-interest stage is on the children. *In re Atchley*, 341 Mich App at 346. Therefore, regardless of why the children had been in care for so long, after three years, they needed "permanency, stability, and finality." See *In re Gonzales/Martinez*, 310 Mich App at 434 (quotation marks and citation omitted). Both foster placements expressed a willingness to provide permanence for their respective wards.

As to the twins, the foster-care specialist reported that their foster mother ensured that they received all the services that they needed. BG had a number of medical issues that required physical and occupational therapy, and although MG did not yet need specific services, Early On was monitoring her development. The foster-care specialist testified that both MG and BG had been in physical therapy, and BG also had received occupational therapy, orthotic services, and a swallow study. Their foster mother keep accurate records of both girls' needs and progress. The foster-care specialist testified that WP, who was placed in the same foster home as the twins, was attending regular endocrinology appointments for his diabetes, and he was also receiving intensive, in-home services to address his mental-health needs. In addition, the foster-care specialist testified that these three children's great grandparents expressed a desire to stay in touch with them, which the children's foster mother supported and had already acted upon.

Respondent-mother argues that the lack of a parent-child bond between her and the twins should not be held against her because the twins never lived with her. Although the twins never lived with respondent-mother, they were removed at birth because of concerns about respondent-mother's drug use and the focus of the best-interest analysis is on the children, not on respondents. See *In re Atchley*, 341 Mich App at 346.

Both respondents argue that the trial court erred by finding by a preponderance of the evidence that terminating their parental rights was in WP's best interests. Respondents insist that WP's best interests differed significantly from those of the other children because he was bonded with respondents and wanted to be returned to them, and, because of his age, he was unlikely to be adopted. It is true that WP had a stronger parent-child bond with respondents than did the other children. However, the strength of a child's bond is only one factor among many that the trial court should consider. See *In re White*, 303 Mich App at 714. Although WP exhibited a bond with respondents, WP's need for "permanency, stability, and finality" and the willingness of his foster parent to provide permanency; the advantages of the foster home; and respondents' parenting skills and their failure to fully comply with their treatment plan preponderated toward finding that the termination of respondents' parental rights was in WP's best interests.

The record shows that the trial court weighed a number of factors when considering the children's best interests, including their bonds, or lack thereof, with respondents; respondents' parenting skills and failure to fully participate in, and benefit from, their treatment plan; the children's need for permanency and finality; the advantages of the foster homes; and the willingness of the foster parents to provide permanency. We conclude that the trial court did not clearly err by finding by a preponderance of the evidence that termination of respondents' parental rights was in the children's best interests.

Affirmed.

/s/ Michael J. Kelly
/s/ James Robert Redford
/s/ Kathleen A. Feeney